STATE OF MAINE
YORK, ss.
SUPERIOR COURT
DOCKET NO. CV-13-041

ROBERT M. COTE et al.,

Plaintiffs,

v.

**ORDER**

DONALD R. COTE et al.,

Defendants.

## I.    Background

### A.  Procedural History

This case involves siblings disputing the substance of and rights to a deceased parent's property. Plaintiffs Robert, Rene, and Paul Cote and Madeline LaPlante ("the plaintiffs") initiated this action with a complaint alleging multiple counts for tortious interference with an expectancy of inheritance, undue influence, improvident transfers, and breach of constructive trust against Defendants Donald, Priscille, and Angela Cote ("the defendants"). The court dismissed all counts except for those alleging tortious interference with an expectancy. The defendants now move for summary judgment.

## B. Facts[1]

Defendants Donald Cote and Priscille Cote are siblings; Donald and Angela Cote are husband and wife. (Def.'s S.M.F. ¶¶ 1-2.)[2] Donald and Priscille and plaintiffs Robert, Rene, Madeline, and Paul Cote are all children of Fern Cote and Pauline Cote. Fern died in 1991 and Pauline died on September 3, 2010. (Def.'s S.M.F. ¶¶ 2-3.) Plaintiff Paul Cote described Pauline as "frugal," "active," "strong willed," and "stubborn" before her death. (Def.'s S.M.F. ¶ 22.) For example, Pauline apparently continued to climb ladders to shovel snow off her roof until 2003-2004. (Def.'s S.M.F. ¶ 25.)

In 2001, Pauline executed a will that bequeathed her entire estate to her children in equal shares. (Pl.'s S. Add'tl. M.F. ¶ 6.) Pauline's 2001 will appointed Donald and Priscille as the personal representatives of her estate. Following Pauline's death, Donald and Priscille were appointed co-personal representatives by the court and petitioned for an Order of Complete Settlement of the Estate on November 22, 2011. (Def.'s S.M.F. ¶5-6.) According to documents from the estate administration proceedings, Pauline died with $14,222.38 in two bank accounts, a number of personal items, and forty-two savings bonds with a total value of $27,767.96. (Def.'s S.M.F. ¶¶ 9-11.)[3] Funds from the bank

---

[1] The plaintiffs submitted an "amended" opposition more than 21 days after the defendants moved for summary judgment. M.R. Evid. 7(c)(2). Because the responses to material facts in the amended opposition do not substantially differ and the additional statements of material fact are the same, the court considers the late filing in ruling on the motion. Ultimately, the defendants are not prejudiced because the outcome is the same. The court denies the defendants' request for sanctions.

[2] "Def.'s S.M.F." refers to Donald and Angela's statement of material facts. Priscille's separate statement of material facts is abbreviated "Def. P.C.'s S.M.F."

[3] The plaintiffs deny or qualify that these assets were the extent of the estate at Pauline's death. Madeline claimed that she believed her mother did not die penniless. (Def.'s S.M.F. ¶ 41.) The plaintiffs repeatedly state they "believe Pauline Cote had substantial assets at the time of her death." (Pl.'s Resp. Def.'s S.M.F. ¶¶ 11-12.) The plaintiffs also deny that the personal items and bonds were properly distributed, but fail to substantiate this denial.

2

account were used to pay estate expenses, which exceeded available funds. (Def. P.C.'s S.M.F. ¶¶ 8-9.)

In 1995, Pauline conveyed her home at 190 Saco Avenue, Old Orchard Beach, Maine, to Priscille and Donald as joint tenants. Pauline retained a life estate in the property. (Def.'s S.M.F. ¶ 4.) The plaintiffs allege that the defendants hold $164,000 in proceeds from a sale of that home in personal bank accounts. (Pl.'s Resp. Def. P.C.'s S.M.F. ¶ 6.) The plaintiffs allege Pauline told them that funds from a sale would be distributed to all the Cote children.[4]

At the time Pauline died, she held several accounts that passed outside of probate: a Banker's Life annuity totaling $76,502.66, a MetLife annuity totaling $21,258.10, and a MetLife insurance policy totaling $18,251.00. (Def.'s S.M.F. ¶¶ 13-14.) Each account listed Donald and Priscille as pay-on-death beneficiaries. (Def.'s S.M.F. ¶ 19.) In 2001, Pauline changed the beneficiaries from Madeline (LaPlante) and Jean Cote to Donald and Priscille. (Def.'s S.M.F. ¶ 31.) Robert and Madeline do not know why the beneficiary form was changed. (Def.'s S.M.F. ¶¶ 33, 40.) The defendants maintain that assets reported in the probate proceeding were all the assets held by Pauline at her death. (Def. P.C.'s S.M.F. ¶ 18.) The plaintiffs deny this and allege Pauline had "substantial" assets.[5] Robert Cote filed an objection to the Order of Complete Settlement of the Estate on

---

[4] Robert's affidavit states the Pauline told him that she "had deeded [the home] to Donald and Priscille a few years after Dad died. They would hold it until her death. Then they would sell it and split the proceeds among all the adult kids. Her Will provided the same ground rules." (Robert Cote Aff. ¶ 51.) Rene's affidavit similarly recounts that Pauline said the proceeds from the house would be split amongst the children. (Rene Cote Aff. ¶¶ 21-22.) While Pauline's statements about this plan were hearsay, they could be construed as statements of intent under Rule 803(3). The court addresses the merit of the plaintiffs' claim to these funds below.

[5] For example, Robert's affidavit claims Fern had a valuable stamp collection that was left to Pauline. (Pl.'s S. Add'tl. M.F. ¶¶ 29-30.)

3

January 12, 2012. (Def.'s S.M.F. ¶7.) This suit was filed in February 2013. (Def.'s S.M.F. ¶ 8.)

Robert Cote alleged in his deposition that the defendants "manipulated" Pauline to "change everything into their names." (Def.'s S.M.F. ¶ 28.)[6] Robert also testified that Fern and Pauline had a number of CDs that were intended to go to the Cote children. (Pl.'s Resp. Def.'s S.M.F. ¶ 30.)[7] Around 2008 or 2009, Robert inquired as to the status of Fern's old bank accounts and received no information from Donald or Priscille. (Pl.'s S. Add'tl. M.F. ¶ 34.)[8] The plaintiffs allege a number of other accounts existed and certain promises were made, including to help Paul purchase a tractor. (Pl.'s S. Add'tl. M.F. ¶¶ 40-44, 46-52.) Paul believed there was a money market account[9] at Saco

---

[6] The plaintiffs attempt to deny this by asserting Robert said many other things. This is not properly controverted and thus deemed admitted.

[7] The plaintiffs allege that Priscille used Pauline's money to pay for her child's college education. (Pl.'s S. Add'tl. M.F. ¶¶ 19-20.) In his affidavit, Robert claims that he "ended up learning there had been several checks made out to Priscille Piper Cote" that the defendants "had probably arranged to find its way to Washington State University." (Robert Cote Aff. ¶ 20.) Robert does not state where or how he received this information or whether it was an unconfirmed belief. As Robert appears to lack personal knowledge, these facts are inadmissible and will not be considered by the court in ruling on summary judgment. M.R. Civ. P. 56(e); M.R. Evid. 602.

[8] Robert also believes that the defendants manipulated Pauline into signing over access to the accounts. (Pl.'s S. Add'tl. M.F. ¶ 35.) The basis for that belief appears to be speculation drawn from what Pauline told Robert: "Pauline would talk about signing paperwork . . . at the insistence of Donald and Priscille." (Pl.'s S. Add'tl. M.F. ¶ 37.) What Pauline said is inadmissible hearsay because the plaintiffs seek to offer the out-of-court statement to prove the truth of the fact Donald and Priscille forced Pauline to sign documents. M.R. Evid. 801, 802. Even if admissible, the statements do not support the proposition stated: the fact Pauline signed documents does not indicate that Pauline signed over control of her accounts. Robert only speculates that this is what occurred: "I am not sure what happened . . . . It appears they only needed her to sign one piece of paper and they were able to empty many accounts." (Robert Cote Aff. ¶ 44.) The court disregards this evidence in considering the summary judgment motion. M.R. Civ. P. 56(e); M.R. Evid. 602. The issue is addressed further below.

[9] Paul alleges that the defendants "somehow" manipulated the account into their control through undue influence on Pauline. The allegation that the money market account was manipulated by the defendants is inadmissible because like Robert, Paul only speculates that this is what occurred. M.R. Civ. P. 56(e); M.R. Evid. 602.

4

Biddeford Savings. (Pl.'s Resp. Def.'s S.M.F. ¶ 36; Pl.'s S. Add'tl. M.F. ¶ 35). Paul's affidavit states:

> At some point after 1999, my sister Priscille got power of attorney from my mother and put Donald's name on that account that my mother had set up for me. She took my name off the account.

(Paul Cote Aff. ¶ 15.)[10] Paul's affidavit also describes a number of accounts held by Fern Cote. (Pl.'s S. Add'tl. M.F. ¶¶ 69-72.)[11]

Renee and Paul Cote both testified that Donald and Priscille "controlled" Pauline. (Pl.'s Resp. Def.'s S.M.F. ¶¶ 22, 24, 26.) Donald and Priscille were named as financial powers of attorney for Pauline in 1995. (Pl.'s S. Add'tl. M.F. ¶ 13.) Priscille managed Pauline's finances from 2006 until she died in 2010. (Pl.'s S. Add'tl. M.F. ¶ 8.) Pauline gave Angela Cote checks to cover heating oil costs. (Pl.'s Resp. Def.'s S.M.F. ¶ 37.) Madeline alleges Pauline was not permitted to have a checkbook and had to ask Donald or Priscille for money to purchase gifts for family members. (Pl.'s S. Add'tl. M.F. ¶ 85.)[12] Pauline was the victim of a "scam" in 2006 that resulted in a withdrawal of $20,000 from one of her bank accounts. (Pl.'s S. Add'tl. M.F. ¶ 15.)

Towards the end of Pauline's life, she was in a weakened state after suffering a stroke in 2008. Priscille sometimes locked Pauline inside her home alone. (Pl.'s S.

---

[10] Paul's affidavit does not explain how or why he was removed from the account and was unable to point to any specific wrongdoing by the defendants other than his suspicion that the defendants were responsible.

[11] As Fern Cote died almost twenty years before Pauline, the relevance of these accounts to this action is not clear, though the plaintiffs appear to rely on these to support their contention that Pauline should have died with "substantial assets."

[12] Madeline's affidavit has similar deficiencies as Robert's, as it contains inadmissible hearsay and assertions about matters that do not affirmatively establish that they are based on personal knowledge. M.R. Civ. P. 56(e); M.R. Evid. 602, 801, 802; *Wescott v. Allstate Ins.*, 397 A.2d 156, 164 (Me. 1979) (stating affiant must "affirmatively" state that they have personal knowledge and such competence to testify must be "obvious").

5

Add'tl. M.F. ¶¶ 16-17.)[13] Priscille did not consult the other siblings about important decisions regarding Pauline and consulted only Donald about having Pauline move in with Priscille after her stroke. (Def.'s Resp. Pl.'s S. Add'tl. M.F. ¶ 18.) Affidavits by Paul and Robert claim Priscille, Donald, and Angela interfered with their efforts to spend time with Pauline. (Pl.'s S. Add'tl. M.F. ¶¶ 19-20.) Madeline tried to move in with Pauline, but was ordered out by Priscille. (Pl.'s S. Add'tl. M.F. ¶¶ 23-24.) Priscille moved in with Pauline and hired a caretaker, Helen, to care for Pauline while Priscille was at work. (Pl.'s S. Add'tl. M.F. ¶ 26.) During this time, Priscille apparently did not provide information to Robert about Pauline's welfare. (Pl.'s S. Add'tl. M.F. ¶ 32.)

Priscille had previously brought Pauline to an attorney, Mary Toole, who drew up the 1995 deed for the home, the power of attorney for Priscille and Donald, and Pauline's 2001 will. (Pl.'s S. Add'tl. M.F. ¶¶ 9-10, 14.) Paul later tried to arrange a family meeting of the Cote children to arrange for Pauline to get a new attorney. (Pl.'s S. Add'tl. M.F. ¶¶ 64-65.) Paul apparently sought to arrange this meeting because Pauline told him she wanted to remove Priscille from power of attorney and Donald from being executor of the will, but Pauline later changed her mind. (Pl.'s S. Add'tl. M.F. ¶¶ 62-63.)[14] When Priscille found out about the plan for Pauline to change attorneys at a family gathering, she grabbed Paul and said "you won't get this (change) without a fight from me!" (Pl.'s S. Add'tl. M.F. ¶ 66; Paul Cote Aff. ¶ 35.) Pauline ultimately decided she did not wish to change attorneys. (Pl.'s S. Add'tl. M.F. ¶¶ 67-68.)

Paul alleges that Priscille told him he would "never get a penny" from Pauline's estate. (Pl.'s S. Add'tl. M.F. ¶ 55.) After Pauline's death, Paul went to Donald and

---

[13] The parties dispute whether and who changed the locks to Pauline's home.

[14] Pauline's statement is hearsay but admissible as a statement of intent under the state of mind exception. M.R. Evid. 803(3).

Angela's home to discuss the estate. Angela became agitated and shouted "when are all you losers going to accept the fact that Mom and Dad only wanted Donald and Priscille as children—and not the rest of you losers?" (Pl.'s S. Add'tl. M.F. ¶ 60.) Donald then told Paul "if you don't like [what is going on with Pauline's estate], you can take me to court, but in the meantime, I will enjoy spending your money." (Pl.'s S. Add'tl. M.F. ¶ 61.)[15]

## II.    Discussion

### A.  Summary Judgment Standard

"Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Dussault v. RRE Coach Lantern Holdings, LLC*, 2014 ME 8, ¶ 12, 86 A.3d 52. The court draws "all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." *Balser v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers (IUE) Local 201*, 661 F.3d 109, 118 (1st Cir. 2011) (citations and internal quotation marks omitted). A party opposing summary judgment must "come forward with affidavits or other materials setting forth by competent proof specific facts that would be admissible in evidence to show . . . that a genuine issue of fact exists." *Bangor & A. R. Co. v. Daigle*, 607 A.2d 533, 535-36 (Me. 1992). "Evidence of factual elements offered to prove a claimed tort . . . need not be persuasive at [the summary judgment] stage, but the evidence must be sufficient to allow a fact-finder to make a factual determination without speculating." *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759.

---

[15] The defendants object to the statements by Priscille, Donald, and Angela on hearsay grounds. Statements by Priscille, Angela, and Donald are all admissible under the exclusion from the hearsay definition as admissions by party opponents. M.R. Evid. 801(d)(2).

7

### B. Tortious Interference with An Expectancy

A prima facie case requires the plaintiff to establish:

(1) the existence of an expectancy of inheritance; (2) an intentional interference by a defendant through tortious conduct, such as fraud, duress, or undue influence; (3) a reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's interference; and (4) damage resulting from that interference.

*Morrill v. Morrill*, 1998 ME 133, ¶ 7, 712 A.2d 1039. The fact a plaintiff is the decedent's child can be sufficient for a fact-finder to infer the plaintiff has an expectation of an inheritance. *Id.* ¶ 8. In addition to testamentary bequests that pass through probate, non-probate devices and accounts that pass property by contract can constitute an expectancy. *Morrill v. Morrill*, 679 A.2d 519, 521 (Me. 1996).

The parties do not dispute the first element. An expectation of an inheritance existed because the plaintiffs were to receive a share of the estate under the 2001 will. Ultimately, however, there were insufficient funds in the estate for distributions to be made to them. The plaintiffs allege that the defendants tortiously induced Pauline to make inter vivos transfers of property or change beneficiary forms in a scheme to deplete or divert funds that they would have received. *Cyr v. Cote*, 396 A.2d 1013, 1017 (Me. 1979) (tortious interference claim based on real estate and a savings account that would have passed to plaintiff, but for alleged undue influence resulting in inter-vivos transfers). In proceeding under this "depletion" theory, the plaintiffs must "present evidence on the source, nature and extent of the expected inheritance" with which the defendants interfered. *Morrill*, 1998 ME 133, ¶ 8, 712 A.2d 1039. In other words, that certain property existed that should have, but did not go to them because of the defendants' tortious conduct. This goes to the second element: whether the defendants intentionally interfered. The plaintiffs allege undue influence. (Pl.'s Opp. Summ. J. 9-12.)

8

### 1. Undue Influence and Confidential Relationships

"Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Russo v. Miller*, 559 A.2d 354, 358 (Me. 1989). A presumption of undue influence arises if the plaintiff can establish, by a preponderance of the evidence, a "confidential relationship" between the decedent and the defendant. *Theriault v. Burnham*, 2010 ME 82, ¶ 6, 2 A.3d 324. A "confidential relationship" exists where there is "trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation." *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975). The party must also receive a benefit from the undue influence. *Id.* at 37. "The existence of a confidential relationship is a question of fact." *Estate of Campbell*, 1997 ME 212, ¶ 6, 704 A.2d 329.

In *Estate of Campbell*, the Law Court affirmed the finding that a confidential relationship arose and was abused: the decedent was 85 and in failing health, the defendant was responsible for the decedent's finances, the defendant initiated a transfer of two cottage properties to himself and told the decedent the properties would remain in the family and funds would be used to pay for her nursing home, and concealed the transfer from other family members. 1997 ME 212, 704 A.2d 329. Under these circumstances, the court employed equitable powers to impose a constructive trust over the properties.[16]

---

[16] The plaintiff did not assert a claim for tortious interference with an expectancy, so this was not addressed by the court.

9

In *Theriault v. Burnham*, the Law Court concluded there was sufficient evidence of a confidential relationship to support a jury's damage award for tortious interference with an expectancy. The court pointed to the following facts that supported the finding that defendant Burnham unduly influenced the decedent Dingley :

> (1) Burnham pressured Dingley to change her will, threatening to leave her unassisted if she did not leave Kent's Landing to him; (2) Burnham took Dingley to his lawyer to have her will changed; (3) Burnham separated Dingley from others who might influence her decision; (4) Burnham began to evict another devisee from Kent's Landing over Dingley's expressed preference and without her consent; (5) Burnham's lawyer represented Dingley in the eviction proceedings; (6) Burnham would not let Dingley see the new will after its execution; (7) Burnham was Dingley's power of attorney and health care agent; and (8) Dingley was dependent on Burnham to transport her, cook her meals, and write all of her checks. This evidence also supports a finding that Burnham had a confidential relationship with Dingley.

2010 ME 82, ¶ 7, 2 A.3d 324.

The following undisputed facts suggest that a confidential relationship existed between Pauline and the defendants: (1) Priscille brought Pauline to Attorney Mary Toole, who Priscille chose; (2) Priscille and Donald acquired power of attorney in 1995; (3) the home was deeded to Priscille and Donald the same year; (4) Pauline's will was changed in 2001, after Priscille and Donald became more involved; (5) Mary Toole drew up the power of attorney, the deed, and the 2001 will; (6) Pauline depended on Priscille, Donald, and Angela for care, transportation, and management of her finances; (7) Priscille, Donald, and Angela all limited the ability of the plaintiffs to spend time with Pauline and learn information about her wellbeing. Viewing these facts in light most favorable to the plaintiffs, there is prima facie evidence of a confidential relationship. With disputed issues of material fact, the defendants are unable to defeat this presumption on summary judgment.

10

While this conclusion would effectively shift the burden to the defendants to disprove undue influence, the mere fact that a confidential relationship existed and the defendants received property from Pauline does not necessarily render the defendants liable for tortious interference:

> The law does not prohibit a party in a confidential relationship from transferring property to the superior party in the relationship, even by gift. Rather, the law seeks to ensure that transfers within these types of relationships are the true intent of the grantor and not the product of fraud or undue influence on the part of the grantee.

*Morrill*, 1998 ME 133, ¶ 5, 712 A.2d 1039. The court was clear that a plaintiff retains the burden of proof on the other three elements. *See id.* ¶¶ 5-7. (discussing that undue influence burden-shifting does not alleviate the plaintiff's burden to establish prima facie evidence on remaining elements of tortious interference of an expectancy). The next element requires the plaintiffs prove to a "reasonable certainty" the nature and extent of their expected inheritance that would have been realized but for undue influence of the defendants. *Id.* ¶ 7.

## 2. "Reasonable Certainty" of Expectancy

A plaintiff must establish "proof amounting to a reasonable degree of certainty that the bequest or devise would have been in effect at the time of the death of the testator" but for the defendant's tortious interference. Restatement (Second) of Torts, § 774B cmt. d (1979); *see also Plimpton v. Gerrard*, 668 A.2d 882, 886 (Me. 1995) (adopting Restatement). Establishing causation to a "reasonable certainty" requires "proof of a high degree of probability" that the defendant was a "but for" cause that deprived the plaintiff of an expected inheritance. *Id.* Plaintiffs must also prove the

11

"extent" of the expectancy, as in the amount or value, to a "reasonable degree of certainty." *Morrill*, 1998 ME 133, ¶¶ 8-9, 712 A.2d 1039.

The defendants argue that the scope of assets the plaintiffs allege they were deprived of "is vague at best and totally illusory at worst." (Def.'s Mot. Summ. J. 11.) Plaintiffs respond that the life insurance policy to which Madeline was at one time a beneficiary, "various" money market accounts, and "various" CD accounts constituted assets that were expected inheritances. (Pl.'s Opp. Def.'s Mot. Summ. J. 13.) While the plaintiffs make rather vague references to account documents and conversations with Pauline, some several decades in the past, there is evidence in the record that the plaintiffs were at some time beneficiaries to non-probate devices and bank accounts. (Pl.'s S. Add'tl M.F. ¶¶ 40-44, 46-52.) This is likely sufficient evidence of the "extent" of the expectancy at the summary judgment stage. The plaintiffs are not required to prove the expectancy "with exactitude." *Morrill*, 1998 ME 133, ¶ 8, 712 A.2d 1039.

There are, however, serious deficiencies in the other evidence the plaintiffs rely upon to prove that the defendants' conduct was a "but for" cause that deprived them of the expectancy. Key portions of the affidavits relied upon by the plaintiffs are fraught with hearsay and ambiguity as to whether the affiant had personal knowledge of the matter asserted.[17] In relevant part, Rule 56(e) states:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . . When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of that party's pleading, but must respond by affidavits or as otherwise provided in this rule, setting forth specific facts showing that there is a genuine issue for trial.

---

[17] *See supra* notes 7, 8, 9, 10, and 12 for a discussion of the particular deficiencies in specific affidavits underlying the plaintiffs' material facts.

M.R. Civ. P. 56(e).

An affidavit from an interested witness can establish or dispute a material fact. *Stanley v. Hancock Cnty. Comm'rs*, 2004 ME 157, ¶ 19, 864 A.2d 169; *see also Fuhrmann v. Staples the Office Superstore E., Inc.*, 2012 ME 135, ¶ 16, 58 A.3d 1083 (noting "'self-serving' statements and circumstantial evidence can be used to establish or dispute a material fact"). On the other hand, an affiant's self-serving, conclusory, and unsupported assertion that he or she has personal knowledge may be insufficient to establish or dispute a material fact. *Beneficial Me. Inc. v. Carter*, 2011 ME 77, ¶ 15, 25 A.3d 96 (affidavit failed to state the basis for personal knowledge). Affidavits made "on information and belief" may comply with the rule "provided that, when viewed in its entirety, it 'shows obviously that all pertinent parts thereof were made from personal knowledge' of the affiant." *Wescott v. Allstate Ins.*, 397 A.2d 156, 164 (Me. 1979) (citation omitted). The affiant "must show *affirmatively*" that he or she has personal knowledge of the matters asserted. *Id.* (emphasis added); *see also Colby v. York Cnty. Comm'rs*, 442 A.2d 544, 548 (Me. 1982) (holding that because affiant failed to state he was present at the hearing described in the affidavit, personal knowledge was not obvious, and thus affidavit was legally insufficient under Rule 56).

In opposing summary judgment, the plaintiffs rely on inadmissible hearsay. Affidavits submitted by Paul, Madeline, Rene, and Robert all contain assertions that rely on statements Fern and Pauline made to them while they were alive. Assuming some of Pauline's promises to the plaintiffs about intended bequests may be admissible under Rule 803(3), that exception has limits. *See Estate of Utterback*, 521 A.2d 1184, 1188

13

(Me. 1987). The exception for then existing mental, emotional, or physical condition states:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

M.R. Evid. 803(3).

Particularly important to plaintiffs' proof of tortious conduct and causation are statements by Pauline about signing papers: "Pauline would talk about signing paperwork . . . at the insistence of Donald and Priscille." (Pl.'s S. Add'tl. M.F. ¶ 37.) This is a statement about what occurred in the past—that Priscille and Donald had made Pauline sign documents. Unlike some of Pauline's other statements, these statements are not admissible under Rule 803(3) because they are a fact remembered rather than a statement of future intent. *See* Field & Murray, *Maine Evidence* § 803.3 at 474 (6th ed. 2007) (quoting Justice Cardozo: "Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backward to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.") The statements are inadmissible hearsay because the plaintiffs offer them to prove that Donald and Priscille made Pauline sign documents. *Cf. Morrill*, 1998 ME 133, ¶ 4, 712 A.2d 1039 (decedent's statements that child was a "loser" and "financially irresponsible" offered to prove parent's view of the child, not that the child was in fact a loser).

Other allegations of wrongdoing in Paul, Madeline, and Robert's affidavits do not clearly indicate the affiant has personal knowledge or appear to be phrased in a manner

14

intended to circumvent an objection. *See, e.g.*, (Robert Cote Aff. ¶ 20, stating he "ended up learning there had been several checks made out to Priscille Piper Cote" that the defendants "had probably arranged to find its way to Washington State University"). This testimony plainly fails to comply with Rule 56. A party cannot phrase averments in an affidavit in manner to avoid objections for lack of personal knowledge and hearsay where the assertions are offered for their truth. *Lubar v. Connelly*, 2014 ME 17, ¶ 42, 86 A.3d 642.

Fatally, the plaintiffs have not adduced prima facie evidence of causation. Most of the plaintiffs' evidence of annuities, money market accounts, and CDs in their names and the alleged changed occurred *prior* to when Priscille began to control Pauline's finances in 2006. (Pl.'s S. Add'tl. M.F. ¶ 8.) The only direct evidence that a change was made that causally deprived any plaintiff of an expected inheritance was the change of beneficiary form that removed Madeline. The plaintiffs do not know why or how this change was made, nor do they substantiate the allegation Donald or Priscille employed undue influence to change the form. It is not enough to prove the change was made; the plaintiffs must come forward with evidence the defendants were a "but for" cause that deprived the plaintiffs of the expectancy. (Def.'s S.M.F. ¶¶ 33, 40.) The only evidence that marginally supports the plaintiffs' theory of wrongdoing derives from Pauline's statements about signing documents, which is inadmissible hearsay for the reasons explained above. Yet even if Pauline's statements about signing documents were admissible, the plaintiffs put forth no evidence as to what the documents were, whether they governed accounts that had been in their names, or how the defendants used the documents to interfere with their expectancy. The plaintiffs offer suspicions that would

15

not be admissible at trial. This is most clearly illustrated by Robert's affidavit, which states in relevant part: "I am not sure what happened . . . . It appears they only needed her to sign one piece of paper and they were able to empty many accounts." (Robert Cote Aff. ¶ 44.)

The fact Donald and Priscille held power of attorney and their names were added to accounts does not prove wrongful conduct, particularly where they were otherwise lawfully authorized to help pay bills and manage Pauline's finances. *See Burdzel v. Sobus*, 2000 ME 84, ¶ 12, 750 A.2d 573 (emphasizing "bare fact" defendants' names were on accounts "does not indicate malfeasance"). Neither does the fact that the plaintiffs allege transfers were made out of Pauline's account indicate the defendants were depleting funds that would have gone to the plaintiffs. *Id.* (noting $100,000 transfer out of an account could not establish wrongdoing by the defendant because the ledger did "not indicate the nature of the investment made, the purpose of the investment, or its intended beneficiaries"). Finally, although the plaintiffs state that the defendants hold proceeds from the sale of the home in a personal bank account pending resolution of Pauline's estate, this does not establish that the defendants hold those funds as a result of wrongdoing. (Pl.'s S. Add'tl. M.F. ¶ 78.)[18]

While the plaintiffs can rely on the confidential relationship to establish undue influence, they cannot shift the burden to prove causation. The plaintiffs must carry that

---

[18] For example, the plaintiffs do not allege the defendants committed fraud. The plaintiffs emphasize Pauline generally wanted all the children to share equally in her estate. Pauline, however, deeded the home to Priscille and Donald outright, reserving a life estate for herself. As a result, the home is not part of the estate. It is undisputed the plaintiffs knew this in 1995 and failed to object. (Pl.'s S. Add'tl M.F. ¶ 54.) The gravamen of the plaintiffs' undue influence allegations occurred well after the 1995 transfer and thus there is no causal relationship. *Cf. Estate of Campbell*, 1997 ME 212, ¶ 9, 704 A.2d 329 (defendant abused confidential relationship to unduly influence decedent to convey property).

burden. The plaintiffs must establish causation to a "reasonable certainty"—"a high degree of probability" that "but for" the defendants' undue influence, the plaintiffs would have received an inheritance. Restatement (Second) of Torts, § 774B cmt. d. In cases where a confidential relationship shifted the burden to the defendants to disprove undue influence, there was evidence of a causal relationship between specific property transfers and wrongful tortious conduct by the defendants. *Theriault v. Burnham*, 2010 ME 82, ¶ 4, 2 A.3d 324 (defendant threatened to stop caring for testator unless she changed her will to leave him her home and refused to show her the will after execution); *Estate of Campbell*, 1997 ME 212, ¶ 9, 704 A.2d 329 (defendant fraudulently convinced decedent to transfer title to two properties and lied to decedent's family about the transaction).

The plaintiffs rest their entire case on the inference that because Pauline died with less money than they believed she should have had and they did not receive promised gifts, the defendants are responsible. The plaintiffs allege a causal connection but fail to substantiate the connection beyond conclusory allegations of wrongdoing. Animosity among the parties does not prove wrongdoing. Even when viewed in the light most favorable to the plaintiffs, in the absence of properly admissible evidence, the plaintiffs' unsupported allegations invite a fact-finder to speculate. This is insufficient to generate a disputed issue of a material fact. *Estate of Smith v. Cumberland Cnty.*, 2013 ME 13, ¶ 19, 60 A.3d 759; *Burdzel*, 2000 ME 84, ¶ 14, 750 A.2d 573 (noting summary judgment on tortious interference claim where record contained no evidence of tortious conduct by defendants that complied with M.R. Civ. P. 7(d)(2)). The inference urged by the plaintiffs surely falls well short of establishing causation to "high degree of probability" required to place this element in dispute, which entitles the defendants to summary judgment. *See*

17

*Cyr v. Cote*, 396 A.2d 1013, 1019 (Me. 1979) (concluding "largely speculative" testimony about expected inheritances was insufficient to create and issue of fact for a jury).

### III. Conclusion

For the reasons set forth above, the defendants are entitled to summary judgment on the plaintiffs' remaining claims for tortious interference with an expectancy.

The clerk shall make the following entry on the docket:

Defendants Priscille Cote, Donald Cote, and Angela Cote's motions for summary judgment are hereby GRANTED as to the remaining counts alleging tortious interference with an expectancy. All other requests for relief are hereby DENIED.

SO ORDERED.

DATE *April 22*___, 2015

John O'Neil, Jr.
Justice, Superior Court

18

CV-13-41

ATTORNEY FOR PLAINTIFF:
DANIEL WARREN
JONES & WARREN PA
243 US ROUTE ONE
SCARBOROUGH ME  04074


ATTORNEY FOR DEFENDANT: PRISCILLE J COTE
DANIEL CUMMINGS
NORMAN HANSON & DETROY LLC
TWO CANAL PLAZA
PO BOX 4600
PORTLND ME  04112-4600

ATTORNEYS FOR DEFENDANTS: DONALD R & ANGELA COTE
ANDREW SPARKS
HEATHER T WHITING
JULIA PITNEY
PATRICK C LEVER
DRUMMOND & DRUMMOND
ONE MONUMENT WAY
PORTLAND ME  04101